491 F.2d 1364
 7 Fair Empl.Prac.Cas. 627, 7 Empl. Prac. Dec. P 9233
R. L. JOHNSON, Plaintiff-Appellant-Cross Appellee,
v.
The GOODYEAR TIRE & RUBBER COMPANY, SYNTHETIC RUBBER PLANT,
et al., Defendants-Appellees-Cross Appellants, International
Union of Operating Engineers, AFL-CIO, Local Union No. 347,
Defendant-Appellee-Cross Appellee.
INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-CIO, LOCAL
UNION NO. 347, Plaintiff-Cross Appellee,
v.
The GOODYEAR TIRE & RUBBER COMPANY, HOUSTON CHEMICAL PLANT,
Defendant-Appellee-Cross Appellant.
 No. 73-1712.
 United States Court of Appeals, Fifth Circuit.
 March 27, 1974.
 
 Gabrielle K. McDonald, Mark T. McDonald, Houston, Tex., Jack Greenberg, William L. Robinson, Morris J. Baller, C. Vernon Mason, New York City, for R. L. Johnson.
 V. Regan Burch, Jr., Houston, Tex., for Goodyear Tire & Rubber Co. et al.
 William N. Wheat, Houston, Tex., for Intern. Union of Operating Engineers.
 William A. Carey, Gen. Counsel, Julia P. Cooper, Associate Gen. Counsel, Beatrice Rosenberg, Joseph T. Eddins, Josephine A. Trevathan, Charles L. Thomas, Attys., E.E.O.C., Washington, D.C., amicus curiae.
 Before GEWIN, AINSWORTH and MORGAN, Circuit Judges.
 GEWIN, Circuit Judge:
 
 
 1
 One of our nation's emerging legal and moral precepts is that persons may not be denied employment on the basis of their race. When the employment relationship becomes tainted with racial discrimination, federal remedial legislation has created a right of action ensuring that a discriminatee may be made whole for an employer's misconduct. As in other instances, the legislative branch has placed a heavy burden on the judiciary in the ultimate resolution of such grievances. It is our difficult task, therefore, under inherent equitable principles to devise the manner, means and method for resolving these disputes. In this regard, the complexity of the judiciary's responsibility is further enhanced by the tremendous volume and variety of the cases emanating from pervasive and prohibited employment practices. Today we are obliged to determine the appropriateness of a back pay award and other remedial relief needed to restore a class which has been subjected to prohibited racial discrimination to the economic level it would have achieved but for the employer's discriminatory conduct.
 
 As we have stated in a related context:
 
 2
 It may be observed that on the surface the present case concerns only the meaning of certain statutory provisions. But beneath the legal facade a faint hope is discernible rising like a distant star over a swamp of uncertainty and perhaps of despair. Those who love their work may sometimes forget that a successful human community requires the performance of many vapid and colorless tasks. Even the most tedious physical labor is endurable and in a sense enjoyable, however, when the laborer knows that his work will be appreciated and his progress rewarded. The ethic which permeates the American dream is that a person may advance as far as his talents and his merit will carry him. And it is unthinkable that a citizen of this great country should be relegated to unremitting toil with never a glimmer of light in the midnight of it all.[1]
 
 I. The Facts
 
 3
 On September 17, 1969, appellant R. L. Johnson instituted this employment discrimination action on behalf of himself and all other black employees similarly situated at Goodyear Tire & Rubber Company's plant (hereinafter 'Goodyear') in Houston, Texas. The class predicated its right to relief on Title VII of the 1964 Civil Rights Act[2] and 42 U.S.C. 1981. In order to provide a complete resolution of the issues involved, the class was permitted to join as a party-defendant Local 347 of the International Union of Operating Engineers (the union). Johnson and the class prayed that the court enjoin Goodyear and the union from their continued discriminatory employment practices and requested back wages to make the members of the class allegedly the victims of such discrimination whole.[3]
 
 
 4
 Goodyear's Houston plant was originally operated by the United States Government during the war years of World War II. Goodyear assumed ownership and control in 1955. The plant, which produces synthetic rubber, is divided into the following eight departments: production, utilities, shipping and traffic, receiving and stores, the laboratory, oiler group, fire, and labor.
 
 
 5
 In 1957, Goodyear adopted a policy which required all new hirees to possess a high school diploma and pass certain written tests. These job qualifications were imposed on all new employees except those workers hired into the labor department. Additionally, any tenured employee wishing to transfer out of the labor department was required to meet the new criteria. Those employees hired before 1957 into non-labor department positions however, did not have to meet the new qualifications to retain their positions.
 
 
 6
 The economic status which the labor department occupies within Goodyear's organizational chart is not in doubt. Goodyear admitted and the evidence demonstrates that labor department jobs are the lowest paying positions in the plant. Furthermore, black employees at Goodyear were completely confined to the labor department until 1962. The evidence indicates that even following that date their appearance in the other departments of the plant was slight.[4] The employee composition of the labor department remained all black until September of 1965 when one white employee was hired into it.
 
 
 7
 In 1968, Goodyear promulgated a new employment plan which permitted the transfer of labor department employees to other departments within the plant if they possessed a seventh-grade education and could pass the required examinations. However, potential labor department transferors would lose their accumulated departmental seniority upon transfer. In 1969, Goodyear eliminated the testing barrier for pre-1957 labor department employees but continued the departmental seniority system.[5] Ultimately in July of 1971, Goodyear abandoned its testing and educational requirements for all transfers. Later, on November 8, 1971, Goodyear endeavored to unilaterally modify its collective bargaining agreement with the union which imposed departmental seniority, but on November 19, 1971 the union sought and obtained a preliminary injunction from the district court against any change. The district court resolved that the validity of the seniority provision in the collective bargaining agreement should be decided simultaneously with Johnson's claims since they were inextricably connected.
 
 
 8
 Johnson was hired in 1944 and has been an employee of the labor department since that time. He possesses an eleventh-grade education (considered equivalent to a high school diploma). Notwithstanding Goodyear's various alleged 'affirmative' actions previously enumerated, Johnson has never sought a transfer because such a transfer would deprive him of his accumulated seniority in the labor department.
 
 
 9
 Following trial on the merits, the district court rendered its opinion on August 10, 1972.[6] It held that Goodyear had discriminated against blacks hired before 1957 because they had been assigned automatically to the plant's labor department and subsequently were confined to that department by Goodyear's testing and educational criteria required for a transfer to other departments in the plant. Conjointly as to these black employees, the court enjoined the use of departmental seniority and granted them plant seniority through their first transfer to another department.
 
 
 10
 The court also concluded that blacks hired between 1957 and July 2, 1965 were the victims of proscribed conduct by Goodyear's hiring and transfer practices which placed black employees in the labor department and prescribed a high school diploma for a subsequent transfer to non-labor department positions. Accordingly, it conferred upon these employees plant seniority through their first transfer and forbade the interposition of the educational standard as a barrier to their transfer. The court, however, declined to grant further relief because it determined that Goodyear had not discriminated against blacks hired subsequent to July 2, 1965. It held that Johnson had failed to prove that the tests adversely affected labor department employees seeking transfer subsequent to 1957. The court denied back pay relief except to the named individual plaintiff, Johnson, without delineating any reasons for its conclusion.
 
 
 11
 With respect to the union, the court found that it had impermissibly restricted black employees to the labor department by being a party to the collective bargaining agreement which imposed departmental seniority. The court imposed back pay liability on the union from the time the union sought and received a preliminary injunction against Goodyear's unilateral modification of the seniority agreement until its judgment. Furthermore, it ordered the union to pay one third of the court costs and one third of Johnson's attorney fees.
 
 
 12
 All parties have appealed from the court's judgment. Essentially, Johnson alleges that the district court erred in concluding that black employees hired after 1965 into the labor department were not the victims of discrimination by Goodyear's testing program and in refusing to award class-wide back pay. Goodyear claims that the evidence does not support the finding that the use of the high school diploma as a pre-condition to hire or transfer discriminated against blacks. The union maintains that there was no evidence presented which would provide a basis for the finding that it had discriminated against black employees and thus the lower court erred in holding that it was liable for part of the back pay and counsel fees awarded to Johnson.
 
 II The Employment Practices
 A. High School Diploma Requirement
 
 13
 The district court found that Goodyear's high school diploma requirement began in 1957 for hiring or interdepartmental transfers discriminated against those black employees hired before July 2, 1965 and placed into the labor department. The discriminatory impact of this educational prerequisite on black employees hired into the labor department before 1957 is obvious.[7] The educational qualification had the effect of locking in those labor department employees who wished to transfer but could not because they did not possess a high school diploma. More important, no undertaking was made by Goodyear to eliminate or require further education of those white employees hired into other departments before 1957, who had not obtained a high school diploma. It was not until 1968 that Goodyear removed the educational impediment to transfers by those labor department employees hired before 1957. Thus, the discriminatory effect of the high school diploma criterion continued unabated until 1968 for pre-1957 labor department employees.
 
 
 14
 Furthermore, we believe that the district court was correct in concluding that the high school diploma requirement had a discriminatory consequence on labor department employees hired after 1957. The overwhelming evidence demonstrates that until April 22, 1971, when the education requirement was eliminated by Goodyear, the imposition of the diploma qualification had an ascertainable discriminatory impact on prospective black employees and potential labor department transferors. In 1960, only 39.9% Of Texas blacks possessed a high school education as compared with 66.9% Of Texas whites.[8] This significant disparity was present in the Houston area where 25.3% Of the black population held a high school diploma as compared to 45.8% Of the whites.[9] The 1970 statistics reveal that although the education gap was closing, it had not been dissipated.[10]
 
 
 15
 Goodyear maintains that the lower court improperly utilized the statistics out that Johnson's 1960 statistical points out that Johnson's 1960 statistical data relates to the disparity between the education attainment of blacks and whites of all ages. In contrast, Goodyear prefers to limit the scope of its statistics to the age group '16-24' and those blacks living in the immediate Houston area. Goodyear's geographic and age limitations conveniently ignore the recognized mobility of today's black labor force and the obvious fact that the potential labor pool cannot be limited to one particular age group.[11] A 'young' black individual, whether age 25 or 45, is a potential employee in the Goodyear plant. Moreover, a black individual of rural Texas today, may be an active participant in the Houston labor pool tomorrow.
 
 
 16
 Goodyear's limited and selective interpretation of the 'relevant' statistics overlooks previous judicial precedent. In Griggs v. Duke Power Company,[12] the Supreme Court relied on statistics for the entire state of North Carolina.[13] Even more compelling, in United States v. Georgia Power Company,[14] our court considered statistics for the South as a whole and the immediate Atlanta area.[15] The utilization of these statistics implicitly recognizes the mobility of today's labor force and repudiates any limitations on the ages of potential employees.
 
 
 17
 Goodyear has never attempted to validate its high school diploma criterion.[16] Once it has been established that a diploma barrier has an adverse consequence on potential black employees, the failure of the employer to validate his educational prerequisite, compels the conclusion that it is invalid.[17] In sum, the invalidated diploma requirement adversely affected potential black hirees until its termination on April 22, 1971. Additionally, it had the invidious effect of unduly limiting those black employees hired into the labor department without a high school diploma who subsequently wished to transfer to other sections in Goodyear's plant. The district court properly enjoined its further application until such time as Goodyear could validate its continued imposition.
 
 B. Testing
 
 18
 Following a review of Johnson's evidence on the testing qualification the district court held that:
 
 
 19
 The evidence presented by plaintiff fails to indicate that the testing requirement disqualifies black applicants at a substantially higher rate than white applicants. Accordingly, the Court finds for defendants on the testing requirement.[18]
 
 
 20
 In support of its conclusion that Johnson had failed to prove that the tests utilized by Goodyear had a discriminatory impact, the court noted that between March 31, 1969 and September 30, 1971, 132 black applicants failed the tests compared to 126 white applicants. The court stated that 'this is a difference of less than six percent.'[19]
 
 
 21
 The court's analysis completely misconstrued the factual and legal significance of Johnson's statistics.[20] Although a variance of approximately six percent existed between the total failures of the black and white applicants, over 49% Of the black applicants taking the tests failed, whereas only 15% Of the while applicants did not pass.[21] Consequently, Johnson's evidence clearly revealed the pernicious consequence of the tests on black applicants.[22] One of the tests employed by Goodyear, the Wonderlic test, was found to discriminate against blacks by the Supreme Court in Griggs v. Duke Power Company.[23] Moreover, Goodyear has never endeavored to establish that these tests were job related, despite the fact that the original EEOC regulations on validation were adopted in 1966.[24]
 
 
 22
 Goodyear directs our attention to many statistics which it asserts establish that it has transferred black employees from the labor department and hired blacks from the Houston area in a ratio equivalent to the total black population in the area. However, reliance on such data misinterprets the significance of Johnson's proof. Such evidence does not disprove the essential finding that the tests have a detrimental impact on black applicants. It merely discloses that Goodyear has attempted by other practices to remove the taint of the tests' consequences. The fact still remains that for those potential black hirees and black labor department transferors, these unvalidated testing devices have a substantial invidious effect.[25]
 
 
 23
 Accordingly, we conclude that the district court erred in determining that the tests utilized by Goodyear did not have a discriminatory effect on potential black employees and those black labor department employees seeking transfer to other departments. The tests had the impermissible result of confining black employees to the labor department. The district court, on remand, will enjoin the further use of tests by Goodyear until such time as they have been validated with the EEOC.
 
 C. Seniority System
 
 24
 Concerning the seniority system imposed by Goodyear and the union, the lower court stated:
 
 
 25
 The seniority transfer system employed by Goodyear, and acquiseced in by (the union) had the effect of locking into the labor department the black employees who were initially segregated on a racially discriminatory basis. In order to transfer to a non-labor department job, a black employee had to forfeit his previously earned seniority rights in the labor department. As a result of this system, white applicants who entered a non-labor department position at the same time as black applicants were segregated into the labor department obtained and maintained a distinct advantage over fellow black employees, an advantage predicated solely on past racial discrimination. Goodyear offered essentially no proof which would extricate this system from condemnation because of a substantial business necessity . . .. Accordingly, since Goodyear's seniority transfer system is predicated upon past racial discrimination in segregating black employees into the labor department, this system cannot withstand plaintiff's Title VII attack.[26]
 
 
 26
 The court's findings are supported fully by the record and it correctly applied the applicable legal principles to the instant situation. The principle of the illegality of a facially neutral seniority system superimposed on a history of employment discrimination is so well settled that extended discussion is unnecessary. Once it has been determined that blacks have been discriminatorily assigned to a particular department within a plant, departmental seniority cannot be utilized to freeze those black employees into a discriminatory caste.[27]
 
 
 27
 The district court granted full plant seniority through the first transfer from the labor department to another department. However, it limited the coverage of the decree to employees hired before September 7, 1965, the date the first white applicant was hired into the labor department. Because we have extended the coverage of the high school diploma holding of the district court's opinion to blacks hired into the labor department after July 2, 1965, and have concluded that Goodyear's testing policies did discriminate against blacks hired into the labor department, the coverage of the seniority relief must be extended to November 19, 1971, the date the union was granted an injunction against modification by Goodyear of the departmental seniority plan contained in the collective bargaining agreement.
 
 
 28
 Goodyear complains that the district court erred in failing to order some type of residency requirement for new black transferors who will benefit under the new remedial seniority system. Whether residency requirements should be imposed when a new seniority system is implemented by a trial court is a matter left to the sound discretion of that court.[28] A reading of the district court's judgment amply demonstrates that it considered plant safety in implementing the new seniority system.[29]
 
 
 29
 Thus, Goodyear's contention that residency requirements are needed to provide for plant safety is without merit.
 
 III Relief
 
 30
 Johnson maintains that the trial court erred in refusing to grant class-wide back pay. No reasons were given by the court for the denial of back pay to the class. Goodyear asserts, however, that several findings by the court justify its refusal to grant back pay. Specifically, Goodyear argues that the court found that it had attempted in 'good faith' to remedy its past discriminatory practices through various affirmative action programs. Secondly, Goodyear contends that due to the unsettled state of the law concerning the validity of the diploma and testing requirements at the time these employment practices were utilized, the court properly denied back pay for the class of black employees.
 
 
 31
 Since we have held that all black employees hired into the labor department before April 22, 1971 were the victims of discrimination as a result of Goodyear's testing, diploma requirements and transfer policies, we conclude as a matter of law that the members of this class of discriminatees are presumptively entitled to an appropriate award of back pay unless evidence is adduced to establish as a matter of fact that such discriminatory practices did not adversely affect a particular claimant (or claimants). On remand, the initial burden will be on the individual discriminatee to establish that he is a member of the class discriminated against and thus presumptively entitled to recover back wages under the facts pertinent to his individual claim. If an individual proves his claim and class status, the burden should appropriately shift to the employer to show by convincing evidence, extenuating circumstances, which would support the conclusion that the individual would never have transferred regardless of its employment practices. We discuss this matter in more specific detail infra. Moreover, it is our considered opinion that as a matter of law an employer's good faith actions do not constitute a valid ground for the denial of back pay. Finally, the unsettled nature of the law applicable to a particular employment practice does not constitute a legally cognizable defense to a claim for back pay in a Title VII suit. A discriminatee's claim to back pay under 1981, however, will be limited to July 2, 1965, the effective date of Title VII.
 
 A. Class-wide Back Pay
 
 32
 Our court has never been confronted with the precise issue of whether a district court should award classwide back pay, where the class establishes a prima facie case of employment discrimination.[30] It is obvious to us that where employment discrimination has been clearly demonstrated, employees who have been victims of that discrimination must be compensated if financial loss can be established. Title VII racial discrimination claims present an appropriate area in which to require class-wide back pay.[31] The individual discriminatee has been locked into his undercompensated position precisely because he is a member of an unfavored class. To implement the purposes behind Title VII, a court should give 'a wide scope to the act in order to remedy, as much as possible, the plight of persons who have suffered from discrimination in employment opportunities.'[32]
 
 
 33
 Our holding does not necessarily mean that every member of the class is entitled to back pay. Individual circumstances vary and not all members of the class are automatically entitled to recovery. There should be a separate determination on an individual basis as to who is entitled to recovery and the amount of such recovery. It is clear that all members of the class have been subject to unlawful racial discriminatory practices. Therefore, those who have suffered a loss of pay because of such practices are entitled to appropriate compensation. It is our understanding that approximately 14 members of the class are in substantially the same circumstances as employee Johnson. There are approximately 35 additional employees, making a total of about 50, who were the victims of racially discriminatory practices.
 
 
 34
 In sum, it is our considered judgment that class-wide back pay is available upon proper factual proof of an individual's claim when the aggrieved class has demonstrated cognizable deprivations based on racial discrimination by the employer in the employment relationship. The relief herein ordered is intended to restore those wronged to their rightful economic status absent the effects of the unlawful discrimination. As to monetary relief nothing more is required; nothing less is acceptable.
 
 B. Affirmative Defenses
 
 35
 We now consider certain defenses which are asserted by Goodyear in answer to the claim for class-wide back pay in this employment discrimination suit. First, Goodyear argues that it would be unjust to impose back pay upon it since the district court found that it had proceeded at all times subsequent to the Act to remedy its past discriminatory practices. Johnson strongly contests this finding of the court. We find it unnecessary to resolve this factual controversy since we hold as a matter of law that such a finding is totally irrelevant as a defense to a claim for back pay.
 
 
 36
 Goodyear's argument completely misconstrues the nature of a back pay award. The entire thrust of this contention is based on the premise that back pay in punishment for its misdeeds and thus the court in good conscience should consider the motive of the employer in imposing the 'penalty.' This proposition has been totally rejected by our court. We held recently that:
 
 
 37
 . . . this form of relief may not properly be viewed as a mere adjunct of some more basic equity. It is properly viewed as an integral part of the whole of relief which seeks, not to punish the (employer) but to compensate the victim(s) of discrimination.[33]
 
 
 38
 Our Circuit has been steadfast in its determination to insure that sufficient affirmative relief be provided to vindicate the rights guaranteed by Title VII.[34] In short, back pay awards are not designed to punish the employer but to economically elevate the victims to the status which is rightfully theirs.[35]
 
 
 39
 We refuse to engage in a futile discussion of the de facto or de jure schisms which now rage in the public domain.[36] Our concern is with the results of an employer's actions and relief which effectively eradicates those results if they are discriminatory.[37] It is apparent that regardless of the motive or intent of an employer in implementing his employment practices, Title VII looks to the consequences of his acts.[38]
 
 
 40
 Lastly, Goodyear seeks an umbrella of protection from the imposition of a back pay award by asserting that at the time its admittedly discriminatory employment practices were utilized no judicial tribunal in the land had declared them illegal under Title VII or 1981. In support of its contention, Goodyear bases this defense on our affirmance in LeBlanc v. Southern Bell Telephone & Telegraph Company.[39] LeBlanc is clearly distinguishable factually from the instant case. In LeBlanc, a sex discrimination suit, the employer asserted the defense that he had relied in good faith on a state protective statute in devising and implementing its employment practices applicable to females. There, the employer's practices were in complete accord with Louisiana law concerning working conditions for women. Further, the district court found that the employer had advanced women in other states according to those state laws. Goodyear has failed to disclose to us any Texas laws which required the invidious employment discrimination revealed here. The reason for this efficacious omission is manifest; no similar 'protective' legislation based on racial grounds has ever been enacted in Texas. Such an argument falls of its own weight.[40]
 
 
 41
 In sum, we feel that an employer's alleged reliance on the unsettled character of employment discrimination law as a defense to back pay is unpersuasive. At least since July 2, 1965, the effective date of Title VII, the employers of this nation have been on notice that employment discrimination based on race, whether overt, covert, simple or complex, is illegal. In this case, the employer has been violating the Act as to some employees since that date. If we were to accept the employer's position the effective date would be advanced at least to the date of the Griggs opinion. This result would be untenable and completely at odds with the Congressional purpose evidenced by enacting Title VII. Title VII is strong medicine and we refuse to vitiate its potency by glossing it with judicial limitations[41] unwarranted by the strong remedial spirit of the act.
 
 
 42
 c. Statute of Limitations
 
 
 43
 Johnson maintains that the district court erroneously applied the 90-day statute of limitations for filing a claim with the EEOC as a limitation on relief.[42] Johnson's contention is well supported by United States v. Georgia Power Company,[43] where we held that the 90-day period was not a limitation on the relief available but merely a limitation on the period in which a complaint may be filed.[44] In Georgia Power we held that in a Title VII, suit, the applicable statute of limitations must be supplied by state law. The court there stated that:
 
 
 44
 Title VII and similar statutes created new causes of action which did not exist at common law or under state statutes. In respect to those causes of action which have no close analogies in state law, civil rights statutes have generally been held governed by the limitation on liabilities created by statute. However, where federal laws created rights to back pay as a part of general remedial relief, courts have generally applied the appropriate state statute of limitations governing actions for unpaid wages.[45]
 
 
 45
 Thus, we must look to the applicable Texas statute of limitations on back wage claims to determine what limits will be put on this type of recovery. Our research leads to Article 5526 of the Vernon's Ann.Texas Civil Statutes which limits recovery of back pay to a two-year period. This section has been uniformly applied by the Texas courts to back pay relief.[46]
 
 
 46
 Once a complaint has been filed with the EEOC, the applicable statute of limitations is tolled.[47] Johnson filed his complaint with the EEOC on May 4, 1967. Applying the two-year limitations period would permit recovery from May 4, 1965. However, recovery under Title VII is limited to July 2, 1965, the date the Act became effective. Thus, under Johnson's Title VII cause of action, the class is entitled to an award from the effective date of the Act.
 
 
 47
 Even so, Johnson insists that he is entitled to recovery from May 4, 1965 under the 1981 aspect of his complaint.[48] We think that a balancing of equities presented by the whole area of employment discrimination demands that back pay claims under 1981 be limited to July 2, 1965, the effective date of Title VII. It was not until that date that the employers clearly became aware that they would be held accountable for employment discrimination. Our revitalization of 1981 did not occur until 1970. In our opinion it would be unjust to impose liability before the effective date of Title VII even though we are aware that the two provisions have been interpreted to be procedurally independent in our Circuit. Uniformity in the application of an appropriate back pay remedy is necessary.
 
 
 48
 It is both the function and the duty of a court to balance the various equities presented when determining whether affirmative relief is needed to remove the detrimental effects of past racial discrimination. In an analytical void, free of the harsh history of employment discrimination which impelled Congress to enact Title VII, a court might conclude that a back pay award under 1981 should extend back to the period permitted by the applicable state statute of limitations. It is our unfortunate legacy that private racial discrimination in the employment relationship was long tolerated. Therefore, in addressing ourselves to the problem of private employment discrimination, we think that notice of the proscribed conduct is an essential ingredient for the imposition of an award of back pay. To impose remedial relief after the fact would indeed run against the grain of fundamental fairness which should hopefully be the outcome of any equitable decree.
 
 
 49
 In sum, when an employment discrimination suit is brought under 1981, recovery of back wages will be limited to July 2, 1965 if the applicable state statute of limitations would permit recovery back to that period. The effect of this holding is minimal in terms of the rights being redressed. A review of the applicable state statutes of limitation on back wages in our circuit reveals that most states limit recovery to at least two years.[49] We think this approach provides for a better balancing of equities. Our holding in the instant suit provides for back wages for a potential period of seven years to a substantially large class of discriminatees.
 
 
 50
 Therefore, the class represented by Johnson, having established a prima facie case of employment discrimination, is presumptively entitled to back pay in accordance with the guidelines herein outlined from July 28 1965 until November 20, 1972, the date of the district court judgment, together with interest accruing from the various dates of entitlement. Since, at the same time, the initial burden is now placed on the individual labor department employee to show that he is a member of the recognized class subject to employment discrimination, we think it is appropriate to offer some preliminary observations concerning the manner in which the presumption in favor of the class and the initial burden placed upon an individual employee may be reconciled by the district court.
 
 
 51
 Unquestionably, it is now impossible for an individual discriminatee to recreate the past with exactitude. All of the employee's previous actions were taken against a backdrop of discrimination. It is now extremely difficult for a court to separate a discriminatee's psychological or motivational outlook which were so totally intertwined with the discriminatory atmosphere at the Goodyear plant. What a laborer would have subjectively done in an atmosphere free of racial discrimination is now a matter of pure conjecture. Thus, in resolving whether an individual labor department employee is entitled to class coverage, and a back pay award, a district court should limit its inquiry to objective factors which are both ascertainable and provable. It is obviously not appropriate to list all the factors which a court should rightfully consider.
 
 
 52
 The district court's task will be further complicated since the only criteria which Goodyear previously imposed for transfer have been found by this court to be invalid under Title VII. If an employee can show that he was hired into the labor department before April 22, 1971 and was subsequently frozen into that department because of the discriminatory employment practices established here, then we think the individual discriminatee has met his initial burden of proof unless there are apparent countervailing factors present. It will be incumbent upon Goodyear to show by convincing evidence that other factors would have prevented his transfer regardless of the discriminatory employment practices. If Goodyear wishes to show that a labor department employee would not be qualified for any other job then its proof must be clear and convincing.[50] Any doubts in proof should be resolved in favor of the discriminatee giving full and adequate consideration to applicable equitable principles.[51]
 
 
 53
 Our approach is completely consistent with analogous labor discrimination cases. We have held under the National Labor Relations Act[52] that any doubts about entitlement to back pay should be resolved against the employer.[53] It is the employer who created the discriminatory situation which prevented free choice in the first instance. It is, therefore appropriate to require the employer to show that its invidious limitations on free mobility were not the cause of the discriminatee's current position in the economic ladder.
 
 
 54
 We are not unmindful that in many instances proving entitlement to back pay will be based on probabilities. However difficult the ultimate resolution, discriminatees must be compensated for the unlawful strictures preventing their ascension to a more economically viable job. The Supreme Court has aptly commented:
 
 
 55
 The constant tendency of the court is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery.[54]
 
 
 56
 Of course, many equitable considerations will enter into any resolution of entitlement, but onerous and speculative limitations should not be utilized as a bar to the restoration process.[55]
 
 
 57
 Title VII litigation is now entering what may properly be termed the 'recovery stage.' As the cases cited in our opinion demonstrate, few courts have actually confronted this complex phase in its practical implementation. Our directives here are meant only as guideposts in the thorny path which must yet be traversed. Further explication must await later litigants in their journey through the trial and appellate process. We express full confidence in the competency of district courts to resolve these troublesome issues in a just and equitable manner. It is at the trial level that courts can more effectively resolve the tantalizing, exacting and wearisome issues presented in cases of this nature. Historical facts, emotional claims and biased contentions often accentuate and fructify the nebulous character of evidence adduced to establish the truth in a heated contest dominated by financial considerations. Much depends on the demeanor, attitude and self-interest of the witnesses. Such a situation emphasizes the value and importance of a careful trial court in molding an equitable decree.
 
 IV Union Liability
 
 58
 The district court held the union accountable for back wages accruing from November 19, 1971, the date it granted the union's request for a preliminary injunction against Goodyear's unilateral modification of the seniority provision embodied in the collective bargaining agreement, until November 20, 1972, the date of its judgment. Furthermore, the district court held the union liable for one third of the attorneys' fees awarded or to be awarded to Johnson's counsel and one third of the court costs. The union's liability was based on the fact that it is a party to the collective bargaining agreement which contained the provisions requiring departmental seniority.
 
 
 59
 The only issue raised by the union requiring extended discussion is whether its role as a party to a collective bargaining agreement which is found to violate Title VII is legally sufficient to impose back pay liability. The facts are undisputed that Goodyear and the union were parties to the collective bargaining agreement which contained the provisions for departmental seniority. Although extending coverage to black employees placed into the labor department subsequent to July 2, 1965, we have more importantly affirmed the basic holding of the district court that the departmental seniority provision as applied in this case violated well settled principles of employment discrimination law. Furthermore, we have imposed back pay liability against Goodyear, at least in part, because it was a party to the collective bargaining agreement requiring departmental seniority.
 
 
 60
 The union vigorously contends that the mere fact that it was a party to a discriminatory collective bargaining agreement is legally insufficient to impose back pay liability. It argues that since it is a craft union it had a right to bargain for departmental seniority. Moreover, it points out that the trial court did not strike down departmental seniority per se at the Goodyear plant but only as it applies to the discriminatees and then only through the first transfer.
 
 
 61
 The union contends that the employer was the real instigator of the discriminatory evils established here and that it was merely a passive observer. Despite the union's attempt to present itself in the posture of the helpless negotiator, we think the union deserves more credit for the misdeeds established by Johnson. Several labor department employees testified about their futile attempts to obtain vigorous representation by the union. The union must have known precisely what effect the incorporation of the departmental seniority provisions in the collective bargaining agreement would have on labor department employees. Common sense demands that a union be held to the natural consequences of its labors in negotiating a collective bargaining agreement.[56]
 
 
 62
 Guided by the facts of this case it would be difficult to fasten liability on one party to the labor contract which was a substantial cause of the discriminatory employment practices and grant total immunity from such liability to the other party.[57] The union was more than a passive participant in the contractual arrangements which furnished a substantial contribution to the discriminatory results evident here. We have at a prior point in this opinion eliminated the so-called 'good faith defense.' Although good faith may be considered in limited circumstances, such a concept is of little comfort or benefit to those who have suffered a financial loss as a result of discrimination, be it as a result of good faith or bad faith employment policies.
 
 
 63
 We do not suggest that the union should be penalized because of its insistence on the continued adherence to the terms of the contract. Back pay is not a penalty, but a restoration to the discriminatee of that which rightly belongs to him. Moreover, the company had recognized the discriminatory effects of the seniority provisions of the collective bargaining agreement and had sought to terminate discrimination resulting from it in early November 1971. There had been protracted discussions of this question between the union and management during this period. Sometime prior to the union's application for injunctive relief, it was on notice that Johnson and his class claimed discrimination and that the company had in effect admitted discrimination arising out of the seniority provision. Of course that issue had to be ultimately decided by the district court and it granted the injunctive relief at the behest of the union only to preserve the status quo. At that juncture both Goodyear and the union were far more familiar with the facts than was the district judge who had not heard the evidence. In these circumstances we cannot conclude that the district court abused its discretion in fastening some responsibility on the union for a limited period which resulted in the unlawful discrimination found to exist. However, due to the changed posture of this case on appeal, the court on remand may wish to reconsider its allocation of the back pay liability it finds to exist. We intimate no view on the allocation issue but merely feel that based on the increased liability which will undoubtedly result from this opinion that principles of equity may require a new distribution of the back pay award imposed on both the union and Goodyear. We do not disturb the district court's award of attorneys' fees for services rendered up to the date of its judgment.
 
 V Conclusion
 
 64
 This cause is remanded to the district court for a determination of back wages for the members of the class who were subjected to racially discriminatory employment practices which resulted in economic loss. The use of the high school diploma and testing criteria must be enjoined by the district court until such time as they are validated under applicable EEOC regulations. The costs of this appeal shall be borne equally by Goodyear and the union. In all other respects, the judgment of the district court is affirmed as modified by this opinion.
 
 
 65
 Affirmed in part, reversed in part and remanded with directions.
 
 
 
 [1]
 Miller v. International Paper Company, 408 F.2d 283, 294 (5th Cir. 1969)
 
 
 [2]
 42 U.S.C. 2000e et seq. (1970), as amended, Equal Employment Opportunity Act of 1972, Pub.L.No.92-261, 86 Stat. 103-113
 
 
 [3]
 Previously Johnson had filed a complaint with the Equal Employment Opportunity Commission on May 4, 1967 against Goodyear and the union. On October 23, 1968, the Commission found reasonable cause to believe that Goodyear's testing requirements discriminated against blacks. After conciliation efforts had failed, Johnson received his right to sue letter from the Commission on August 8, 1969
 
 
 [4]
 From 1965 to 1970, 84% Of the new employees hired into the labor department were black. Mr. Vanosdall, Goodyear's personnel manager, testified that around 5% Of all new employees before April, 1971, the date the company adopted a new policy of placing all new employees into the labor department initially, were placed into the labor department. However, during the same period that the company was only placing 5% Of its new hirees into the labor department, over 40% Of the new black hirees were placed into that department
 The following charts reveal Goodyear's policy of placing blacks into the low paying labor department.
 No. & % of New
 No. & % of New Total New White Employees
 Total New Black Employees White Assigned
Year Black Employees Assigned to Labor Employees To Labor
------- --------------- ----------------- --------- ---------------
1965 13 9(69%) 17 1(.6%)
1966-67 22 7(32%) 28 0(0%)
1968 14 4(28%) 25 1(4%)
1969 14 6(42%) 48 4(8%)
1970 17 9(52%) 31 1(3%)
 Year % of Blacks in Labor Department
 ------ ---------------------------------
 9/7/65 100.0
 1966 96.5
 1967 97.0
 1968 94.5
 1969 87.0
 1970 88.0
 Thus, there could be no doubt among Goodyear's employees about which department was the 'black' department.
 
 
 [5]
 The 1969 plan did permit labor department transferors to retain their seniority for two years after their transfer
 
 
 [6]
 349 F.Supp. 3 (S.D.Tex.1972)
 
 
 [7]
 Griggs v. Duke Power Co., 420 F.2d 1225, 1230-1231, 1236-1237 (4th Cir. 1970), aff'd in pertinent part 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1970). See also United States v. Jacksonville Terminal Co., 451 F.2d 418, 456-457 (5th Cir. 1971)
 
 
 [8]
 1960 Census Reports, General Social and Economic Data-Texas, Table 72, at 45-431
 
 
 [9]
 Id. Table 77, at 45-431
 
 
 [10]
 In 1970, 31.9% Of Texas blacks possessed a high school diploma compared with an overall level of 49.5%. See 1970 Census Reports, General Social and Economic Characteristics-- Texas, Table 46, at 45-531. In the Houston area, 32.7% Of the black population had obtained a high school diploma compared with 51.1% Of the total population. Id. Tables 83 and 91, at 45-507 and 45-611
 
 
 [11]
 Limitations on the scope of statistics to the younger individuals only in the labor market would contravene the strictures of the Age Discrimination in Employment Act, 29 U.S.C. 621-634 (1970)
 
 
 [12]
 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)
 
 
 [13]
 Id. at 430, n. 6
 
 
 [14]
 474 F.2d 906 (5th Cir. 1973)
 
 
 [15]
 Id. at 918
 
 
 [16]
 See EEOC guidelines for validation in 29 C.F.R. 1607.1-1607.14. See also United States v. Georgia Power Co., 474 F.2d 906, 911-914 (5th Cir. 1973)
 
 
 [17]
 Griggs v. Duke Power Co., 401 U.S. 424, 431-432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). 'In discrimination cases the law with respect to burden of proof is well-settled. The plaintiff is required only to make out a prima facie case of unlawful discrimination at which point the burden shifts to the defendant to justify the existence of any disparities.' Hodgson v. First Federal Savings and Loan Association of Broward County, Florida, 455 F.2d 818, 822 (5th Cir. 1972); see also United States v. Hayes International Corp., 456 F.2d 112, 120 (5th Cir. 1972)
 
 
 [18]
 349 F.Supp. 3, 15
 
 
 [19]
 Id. n. 7
 
 
 [20]
 For purposes of our review, the 'clearly erroneous rule' is inapplicable where the district court bases its findings on an erroneous view of the controlling legal principles. See Ferran v. Flemming, 293 F.2d 568, 571 (5th Cir. 1961); United States v. Pickett's Food Service, 360 F.2d 338, 341 (5th Cir. 1966); United States v. Jacksonville Terminal Co., 451 F.2d 418, 423-424 (5th Cir. 1971); Rowe v. General Motors Corp., 457 F.2d 348, 356, n. 15 (5th Cir. 1972)
 
 
 [21]
 274 blacks were administered the test by Goodyear between January 1, 1969 and October 30, 1971. Of this group, 132 blacks failed the test or 49%. During the same period, 848 white applicants took the tests. 126 whites failed or 15%
 
 
 [22]
 Courts compare the percentage of each race which passes or fails a particular examination requirement not the absolute difference between the two races. See Castro v. Beecher, 459 F.2d 725, 735 (1st Cir. 1972); Chance v. Board of Examiners, 458 F.2d 1167, 1172 (2d Cir. 1972)
 
 
 [23]
 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The Wonderlic test was discontinued by Goodyear in 1966
 
 
 [24]
 See n. 16 supra. Once it is proven that an employment practice excludes blacks in a higher proportion than whites, it is incumbent on the employer to show that the practices arise from business necessity or that the tests relate to job performance. Griggs v. Duke Power Co., 401 U.S. 424, 431-432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Bing v. Roadway Express, Inc., 444 F.2d 687, 689 (5th Cir. 1971)
 
 
 [25]
 No test for hiring or promotion is valid if it 'operates to exclude Negroes (and) cannot be shown to be related to job performance.' Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). 'When a series of tests operates to exclude more blacks than whites from employment, the burden is upon the employer to prove the business necessity of the tests. If '. . . the jobs in question formerly had been filled only by white employees as part of a longstanding practice of giving preference to whites . . .' and the test operates '. . . to disqualify Negroes at a substantially higher rate than white applicants,' 401 U.S. at 426, 91 S.Ct at 851, then the company's proof must make manifest a relationship between the test and the job for which its passage is prerequisite.' United States v. Georgia Power Co., 474 F.2d 906, 911-912 (5th Cir. 1973)
 
 
 [26]
 349 F.Supp. at 15
 
 
 [27]
 United States v. Georgia Power Co., 474 F.2d 906, 927 (5th Cir. 1973); United States v. Hayes International Corp., 456 F.2d 112, 117 (5th Cir. 1972); United States v. Jacksonville Terminal Co., 451 F.2d 418, 453 (5th Cir. 1971); Local 189, Papermakers & Paperworkers v. United States, 416 F.2d 980, 988 (5th Cir. 1969); Local 53, Asbestos Workers v. Vogler, 407 F.2d 1047, 1054 (5th Cir. 1969); United States v. Bethlehem Steel Corp., 446 F.2d 652, 660-661 (2d Cir. 1971); Robinson v. Lorillard Corp., 444 F.2d 791, 795-796 (4th Cir. 1971), dismissed pursuant to Rule 60, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); United States v. Chesapeake & Ohio Ry. Co., 471 F.2d 582, 593 (4th Cir. 1972)
 
 
 [28]
 If Goodyear was to be successful in imposing 'residency requirements' it had to demonstrate the need for such practice under business necessity. United States v. Jacksonville Terminal Co., 451 F.2d 418, 151 (5th Cir. 1971). It is apparent that Goodyear has failed in its burden of proof
 
 
 [29]
 The district court stated that:
 The remedial seniority transfer rights, as set forth above, shall be subject to reasonable rules and regulations as established by Goodyear and Local 347 to insure the safe and efficient operation of the plant as well as to insure that any employee seeking to exercise these transfer rights is reasonably qualified for the job sought. However, no member of the class involved herein to which the remedy applies shall be subjected to any unduly burdensome residency requirement in a new department prior to moving up through the various lines of job progression which was not previously required of similarly situated employees, white or black, as a condition to the exercise of this remedial seniority in any new department. 349 F.Supp. at 17.
 
 
 [30]
 Indeed, this issue was specifically reserved in the recent case of United States v. Georgia Power Co., 474 F.2d 906, 919, n. 16 (5th Cir. 1973). We have previously held that a Title VII class action cannot be limited to individuals who file charges with the EEOC prior to the institution of the court action. See Miller v. International Paper Co., 408 F.2d 283, 284-285 (5th Cir. 1969); Oatis v. Crown Zellerbach Corp., 398 F.2d 496, 499 (5th Cir. 1968). Accord Sprogis v. United Airlines, 444 F.2d 1194, 1202 (7th Cir. 1971)
 
 
 [31]
 Accord, Robinson v. Lorillard Corp., 444 F.2d 791, 801-802 (4th Cir. 1971); Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 719-720 (7th Cir. 1969)
 
 
 [32]
 Rowe v. General Motors Corp., 457 F.2d 348, 354 (5th Cir. 1972)
 
 
 [33]
 United States v. Georgia Power Co., 474 F.2d 906, 921 (5th Cir. 1973)
 
 
 [34]
 See Culpepper v. Reynolds Metal Co., 421 F.2d 888, 891 (5th Cir. 1970) (District court must insure that the intent of Congress in enacting Title VII is not hampered by limited remedies); Local 53, International Ass'n of Heat & Frost Insulators and Asbestos Workers v. Vogler, 407 f.2d 1047, 1051-1053 (5th Cir. 1969) (District court should redress present effects of past discrimination); Horton v. Lawrence County Board of Education, 449 F.2d 793, 795 (5th Cir. 1971) (Back pay is an integral part of the restoration of plaintiffs to their normal position which they would have but for the discrimination); Harkless v. Sweeny Independent School District, 427 F.2d 319, 324 (5th Cir. 1971), cert. denied 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971), (Back wages are necessary to restore discriminatees to their lawful status); Johnson v. Georgia Highway Express, 417 F.2d 1122, 1125 (5th Cir. 1969) (Back pay is an integral part of the statutory equitable remedy of Title VII). The Supreme Court has stated that '(a) court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of past as well as bar like discrimination in the future.' Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709, 715 (1965); Cf. Swann v. Charlotte-Mechlenberg Bd. of Educ., 402 U.S. 1, 31, 91 S.Ct. 1267, 28 L.Ed.2d 554, 575 (1971); Green v. v. School Board of New Kent County, 391 U.S. 430, 439, 88 S.Ct. 1968, 20 L.Ed.2d 716 (1968); Rosen v. Public Service Gas Co., 477 F.2d 90, 95-96 (3d Cir. 1973); Jurinko v. Edwin L. Wiegard Co., 477 F.2d 1038, 1046-1047 (3d Cir. 1973); Johnson v. Capitol City Lodge No. 74, Fraternal Order of Police, 477 F.2d 601, 602-603 (4th Cir. 1973); Robinson v. Lorillard Corp., 444 F.2d 791, 801 (4th Cir. 1971)
 
 
 [35]
 Other circuits are in accord with the Fifth Circuit approach. See Moody v. Albermarle Paper Co., 474 F.2d 134, 140-141 (4th Cir. 1973); Robinson v. Lorillard Corp., 444 F.2d 791, 804 (4th Cir. 1971); Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 720-721 (7th Cir. 1969). The Seventh and Fourth Circuits held that the basis for granting an injunction and awarding back pay in an employment discrimination suit is equivalent, and therefore, when the need for an injunction arises, back pay should follow. See also Rosen v. Public Service Electric & Gas Co., 477 F.2d 90 (3d Cir. 1973)
 
 
 [36]
 The Eighth Circuit has aptly observed that 'employers seldom admit racial discrimination.' Green v. McDonnell Douglas Corp., 463 F.2d 337, 343 (8th Cir. 1972). Our research leads us to conclude that often the acts relied upon as evidencing good faith are taken in response to the lawsuit filed by the discriminatee. 'Such actions in the face of litigation are equivocal in purpose, motive and permanence.' Jenkins v. United Gas Corp., 400 F.2d 28, 33 (5th Cir. 1968), quoting Cypress v. Newport News General and Nonsectarian Hospital, 375 F.2d 648, 658 (4th Cir. 1967). See also Rowe v. General Motors Corp., 457 F.2d 348, 355 (5th Cir. 1972); Local 53 of the International Ass'n of Heat and Frost Insulators & Asbestos Workers v. Vogler, 407 F.2d 1947, 1055 (5th Cir. 1969)
 
 
 [37]
 Good faith and detrimental reliance have similarly been rejected as an affirmative defense when balancing the equities in awarding damages in other areas of labor law. See N.L.R.B. v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 265, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); American Machinery Corp. v. N.L.R.B., American Machinery Corp. v. N.L.R.B., 424 F.2d 1321, 1328-1330 (5th Cir. 1970); Laidlaw Corp. v. N.L.R.B., 414 F.2d 99, 107 (7th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970); Hodgson v. American Can Co., 440 F.2d 916, 922 (8th Cir. 1971); Wirtz v. Malthor, Inc., 391 F.2d 1, 3 (9th Cir. 1968); Shultz v. Mistletoe Express Service, Inc., 434 F.2d 1267, 1272 (10th Cir. 1970). The relief provisions in Title VII were modelled after a similar provision in the National Labor Relations Act, 29 U.S.C. 106(c) and thus great weight should be given to interpretations under the latter Act. United States v. Georgia Power Co., 474 F.2d 906, 921, n. 19 (5th Cir. 1973)
 
 
 [38]
 Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)
 
 
 [39]
 ,460 F.2d 1228 (5th Cir. 1972), affirming, 333 F.Supp. 602 (E.D.La.1971), cert. denied, 409 U.S. 990, 93 S.Ct. 320, 34 L.Ed.2d 257 (1972)
 
 
 [40]
 Most courts have been very restrictive in permitting a defense of reliance on state protective statutes. See e.g., Schaeffer v. San Diego Yellow Cab, 462 F.2d 1002, 1007 (9th Cir. 1972) (Employer on notice that Title VII preempts state protective statutes from the time a district court so rules even though the district court opinion was not affirmed by the court of appeals for three years). For other judicial reactions to the problem, see Rosenfeld v. Southern Pacific Co., 444 F.2d 1219, 1225-1227 (9th Cir. 1971); Robinson v. Lorillard Corp., 444 F.2d 791, 800-801 (4th Cir. 1971); Manning v. General Motors Corp., 466 F.2d 812, 815-816 (6th Cir. 1972)
 
 
 [41]
 The Fourth Circuit specifically rejected such an argument in Robinson v. Lorillard, 444 F.2d 791, 804 (4th Cir. 1971). Contra United States v. N.L. Industries, 479 F.2d 354 (8th Cir. 1973). In another context, this court has intimated that such an argument has little merit. See Miller v. Amusement Enterprises, Inc., 426 F.2d 534, 536 (5th Cir. 1970). In any event, this court has always held that relief must be granted with an eye to the purpose and policy of the congressional enactment under consideration. See Wirtz v. B. B. Saxon Co., 365 F.2d 457, 462-463 (5th Cir. 1963); Shultz v. 457, 462-463 (5th Cir. 1963); Shultz v. Parke, 413 F.2d 1364, 1368 (5th Cir. 1969)
 
 
 [42]
 42 U.S.C. 2000e-5(d). Under the 1972 Amendments, back pay is limited to a two-year period before a complaint is filed with the Commission. See 42 U.S.C.A. 2000e-5(g)
 
 
 [43]
 474 F.2d 906 (5th Cir. 1973)
 
 
 [44]
 Id. at 922
 
 
 [45]
 Id. at 924
 
 
 [46]
 See Hollingsworth v. Cities Service Oil Co., 199 S.W.2d 266 (Tex.Civ.App.1947); Uhler v. Todd Houston Shipbuilding Corp., 198 S.W.2d 631 (Tex.Civ.App.1947)
 
 
 [47]
 Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968)
 
 
 [48]
 We have previously held that 1981 reaches private employment discrimination based on race. See Sanders v. Dobbs House, 431 F.2d 1097 (5th Cir. 1970). Furthermore, we have held that the applicable statute of limitation for back pay is supplied by state law in a 1981 suit. See Boudreaux v. Baton Rouge Marine Contracting Co., 437 F.2d 1011, 1017, n. 16 (5th Cir. 1971)
 
 
 [49]
 Alabama, one year, Code of Ala., Title 7, 26(1) (1960); Georgia, two years, Ga. Code 3-704 (1962); Florida, one year, F.S.A. 95.11(7)(b) (1960); Louisiana, one year, LSA-C.C. art. 3534 (1961); Mississippi, three years, Miss.Code Ann. 15-1-29 (1972); Texas, two years, Vernon's Ann.Civ.St. Art. 5526 (1970). Thus, with the noted exception of Mississippi, any employment suit filed after July 2, 1967, would not be affected by our holding even if the plaintiff based his right of recovery on Section 1981
 
 
 [50]
 Cooper v. Allen, 467 F.2d 836, 840 (5th Cir. 1972)
 
 
 [51]
 United States v. Bethlehem Steel Corp., 446 F.2d 652, 660 (2d Cir. 1971); United States v. Central Motor Lines, Inc., 338 F.Supp. 532, 560 (W.D.N.C.1971)
 
 
 [52]
 29 U.S.C. 151 et seq. (1970)
 
 
 [53]
 N.L.R.B. v. Miami Coca-Cola Bottling Co., 360 F.2d 569, 572-573 (5th Cir. 1966); N.L.R.B. v. International Operating Eng., Local 925, 460 F.2d 589, 599 (5th Cir. 1972)
 
 
 [54]
 Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 565-566, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Accord, Robey v. Sun Record Co., 242 F.2d 684 (5th Cir. 1957); Household Goods Carrier Bureau v. Terrell, 417 F.2d 47, 53 (5th Cir. 1969)
 
 
 [55]
 For other considerations in awarding back pay, see United States v. Georgia Power Co., 474 F.2d 906, 921-922 (5th Cir. 1973); Bing v. Roadway Express, 485 F.2d 441, 452-455 (5th Cir. 1973)
 
 
 [56]
 The District of Columbia Circuit recently observed that:
 A union's duty, in representing its members and protecting them from invidious treatment, must certainly be broader than simply refusing to sign overtly discriminatory agreements . . .. It would undermine Title VII's attempt to impose responsibility on both union and employers to hold that union passivity at the negotiating tables in such circumstances cannot constitute a violation of the Act. Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979, 989 (1973). See also Peters v. Missouri-Pacific R.R. Co., 483 F.2d 490, 498 (5th Cir. 1973).
 
 
 [57]
 'The rights assured by Title VII are not rights which can be bargained away-- either by a union, by an employer, or by both acting in concert. Title VII requires that both union and employer represent and protect the best interests of minority employees. Despite the fact that a strike over a contract provision may impose economic costs, if a discriminatory contract provision is acceded to, the bargainee as well as the bargainor will be held liable.' Robinson v. Lorillard, 444 F.2d 791, 799 (4th Cir. 1971)