**Rhea SCHWARTZ, Plaintiff,**

v.

**STATE OF FLORIDA and Florida Board of Regents, Defendants.**

**TCA 77–0756.**

United States District Court,
N. D. Florida,
Tallahassee Division.

May 14, 1980.

Ben E. Girtman, Madigan, Parker, Gatlin, Swedmark & Skelding, John D. Carlson, Tallahassee, Fla., for plaintiff.

Herbert D. Sikes, Counsel, State Bd. of Ed., Bishop C. Holifield, University Atty., Tallahassee, Fla., for defendants.

## MEMORANDUM OPINION AND ORDER

STAFFORD, District Judge.

*Findings Of Fact And Conclusions Of Law*

Plaintiff, a white female, brought this complaint pursuant to the Fourteenth

Amendment to the United States Constitution, 42 U.S.C. § 1981 and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* alleging that Florida Agricultural and Mechanical University (FAMU) and the Florida Board of Regents unlawfully discriminated against her on the basis of her sex and race in denying her employment in the position of assistant professor of Exceptional Child Education in the Division of Curriculum and Instruction in the College of Education. FAMU is an Equal Opportunity/Equal Access University.

Subsequent to the denial of employment, Dr. Schwartz filed a charge with the Equal Employment Opportunity Commission and on April 18, 1978 received a right-to-sue letter. On January 7 and 8, 1980, this case was tried before the court without a jury. Fed.R.Civ.P. 39(b). In accordance with Federal Rule of Civil Procedure 52(a), the court makes the following findings of fact relevant to the disposition of this case.

### Findings of Fact

In August of 1976, an assistant professor's position became available at FAMU. The position had previously been filled by a Black female, Ms. Laverne Moore, who retired. The position was advertised as Position # 00270 in the August 27 through September 2, 1976 state university system position vacancy listing. In the listing, the description of qualifications for the position was as follows:

> Doctorate in Exceptional Child Education (Special Education) with concentration preferred in Motor Disabilities or related areas. Conduct undergraduate classes in motor disabilities (mental retardation and specific learning disabilities courses may be included if background is appropriate); must advise undergraduate and graduate students and supervise field experience of Students.[1]

The deadline for application for this nine-month, i.e., "permanent", tenure-earning position was stated to be September 9, 1976. No applications were received in response to the first advertisement of the position.

In order to attract applicants, the Director of Curriculum and Instruction, after conference with the Dean of the School of Education, revised the qualifications for the job and Position # 00270 was advertised again in the November 19 through November 25, 1976 position vacancy listing. This listing described the necessary qualifications as follows:

> Ph.D. strongly preferred; MA/MS with 5 years experience will be considered. Background should include work with motor disabled and mentally retarded children; elementary/early childhood education beneficial.[2]

The deadline for application for the nine-month position was stated to be December 3, 1976. Responses were made to this advertisement and three individuals were subsequently interviewed by the screening committee. Those individuals were the plaintiff herein, Dr. Rhea Schwartz, Mr. John H. Thompkins, a Black male who was ultimately selected for employment in the position, and Mrs. Lillie Bogen, a Black female.

In 1976, Caucasians were considered to be a minority at FAMU and Whites were listed as minority employees on the Equal Employment Opportunity (EEO) reports submitted to the Department of Health, Education and Welfare on behalf of the university. As part of the State of Florida's desegregation plan, the Board of Regents maintained a computerized data base, an applicant "pool", for employment with the university system. Applicants submitted their credentials to the Personnel Programs Office of the Board of Regents for the pool and when state university system listings were prepared by the office, the computer identified those "pool" applicants who had the basic minimum qualifications for advertised positions.

Dr. Schwartz first applied to the applicant pool in the early part of 1975 and, thereafter, kept her application current.

1. Plaintiff's Exhibits 1a, 11a.

2. Plaintiff's Exhibits 1b, 11b.

She was a member of the applicant pool in August of 1976. John Van Beck, Personnel Programs Coordinator for the Board of Regents in 1976, verified that Dr. Schwartz had the "paper qualifications" for Position # 00270 as it was initially advertised. When an applicant in the pool was identified by the computer as having the required qualifications for a position, the Board's standard procedure was to notify the EEO Coordinator on the campus of the pertinent data with respect to such a "qualified" applicant. Van Beck could not personally verify that Dr. Schwartz' name was submitted to FAMU in this way following the first position advertisement, but if procedures were followed, her name and qualifications were forwarded to Herbert Reinhard, EEO Coordinator at FAMU in August of 1976.

In May of 1974, Rhea Schwartz had written to Paul Mohr, Sr., Dean of FAMU's School of Education, informing him that she anticipated completion of her doctorate degree in the summer of 1974 and that she would be available for employment at that time. Dean Mohr acknowledged her letter, explaining that no jobs were presently available, but promising to keep her "in mind." [3]

Rhea Schwartz holds a Ph.D. in Education from Florida State University (FSU), a M.S. in Special Education from Trenton State College, and a B.A. in Early Childhood Education from College of the City of New York, as well as State of Florida Teaching Certificates in Early Childhood Education, Elementary Education, Junior College, Varying Exceptionalities, and Mental Retardation. Dr. Schwartz did not see the August 1976 position vacancy listing for Position # 00270, but she saw the November 1976 advertisement of the position on November 16, 1976. She immediately checked with John Van Beck, who verified that she was in the Board of Regents' applicant pool, that she met the stated qualifications for the position and that she should contact FAMU. Dr. Schwartz went to the

office of FAMU's Affirmative Action Coordinator, Herbert Reinhard. Reinhard sent Schwartz to FAMU's Personnel Office where she was given an application. Dr. Schwartz then completed the application form and took it to Dean Mohr's office, where she was directed to take the application to Dr. Castine's office. On that same day, Dr. Schwartz went to FSU and arranged to have her credentials officially forwarded to FAMU. In late November, well before the closing date, Dr. Schwartz telephoned Dr. Castine to inquire if her completed application was in order. Dr. Castine assured her that everything had been received and her application was complete. Dr. Castine also informed Dean Mohr in November that Dr. Schwartz was applying for the position and that her application was complete. Dr. Schwartz then waited for the closing date for applications to pass. No one could be hired until after Friday, December 3, 1976.

In early November of 1976, Dr. Lillie S. Davis,[4] Coordinator in the College of Education, was asked by Dean of the College of Education, Paul B. Mohr, to assume the leadership role on a search committee which was to "find someone" for the positions of teacher of exceptional child education and of reading teacher. Dr. Davis had never previously chaired a search committee although she had participated in employment interviews. On Friday, December 3, 1976, the closing date for applications, Dr. Davis informed Dean Mohr by letter of her choice of search committee members: Mary Mercer (Black female) whose area was Special Education, Barbara Boardley (Black female) because of her background in Early Childhood Education, and Dr. William H. Castine (White male), whom she "automatically" included because of his position as Director of the Division of Curriculum and Instruction in the College of Education.

Dr. Davis' letter of December 3 refers to the above-named individuals and herself as

3. Plaintiff's Exhibit 10.

4. Dr. Davis, a 24-year veteran of FAMU's faculty, was at the time of trial Chairman of the

Department of Early Childhood Education and Acting Director of Student Teaching with a salary in the range of $24,500 to $25,000 a year.

a team which "would adequately assess Mr. Thompson's [sic] competency to assume the position of assistant professor in Exception [sic] Child Education."[5] Davis volunteers that she will pick Mr. Thompkins up, if the Dean will inform her of his arrival time, suggests that Thompkins be interviewed in the conference room, and concludes by suggesting that she, M. Mercer, Thompkins, and Dr. Palmer attend a conference scheduled to take place in Virginia on January 17–20, 1977, "if they are on board by that time."[6] Davis' letter thus indicates her assumption that Thompkins will be hired as assistant professor.[7]

Dr. Lillie Davis has known John H. Thompkins since 1972 through the Consortium of Southern Colleges for Teacher Education. In October of 1976 they met by chance at the Marriott Hotel in Atlanta. At that time Thompkins was employed part time by Sears, Roebuck and Co. Dr. Davis told Thompkins that she had not yet received his Vita (resume). Thompkins asserted at trial Dr. Davis then informed him that a position was available at FAMU;[8] Davis insists there was no discussion of the job at that time. Thompkins subsequently sent his Vita, without a cover letter, to Dr. Davis. He telephoned Dr. Davis sometime prior to December 6, 1976 and they discussed housing in Tallahassee.

On December 6, 1976, the first working day after the closing date for applications, Dean Mohr telephoned Thompkins and made arrangements for Thompkins' interview on December 9, 1976.[9] On Thursday, December 9, 1976, Thompkins arrived in Tallahassee by plane; Dr. Davis met him at the airport; he met with Dean Mohr before and after his interview, receiving an application form from Mohr at one of those meetings; and he was interviewed by the screening committee for approximately two to two and one-half hours. During the interview, Thompkins was told that the position for which he was being considered was temporary. He expressed continuing interest in the position.

Dr. Davis first testified that the committee had Thompkins' Vita and letters of recommendation before them at the time of Thompkins' interview. After the plaintiff pointed out that the letters of recommendation were written on dates subsequent to the interview and received by the dean's office on December 16, 17 and 20, 1976,[10] Dr. Davis changed her testimony and said perhaps the committee had not had the letters before them.

On December 9, 1976, Thompkins, who holds two M.A. degrees and an Ed.S. from Atlanta University in Early Childhood Education and Special Education and a B.S. degree in Elementary Education from Cheyney State College was interviewed without having completed a formal application for the position, as was then required by FAMU. At the top of the first page of the application form then in use the following note appears:

. . . To complete this application we must have on file transcripts of all college or university credits and three letters of recommendations [sic], one of which must be from a former employer and one from your major advisor in graduate school.

Mr. Thompkins dated his application form December 13, 1976; it was received by Dean Mohr's office on December 15, 1976.

5. Dr. Davis was referring to John H. Thompkins.

6. Plaintiff's Exhibit 3 (Appendix A).

7. *Ibid.* Davis' letter likewise indicates her assumption that Barbara Palmer will be hired as reading teacher.

8. Thompkins' deposition testimony was that he assumed a position was available and proceeded to send a letter of interest to FAMU.

9. Thompkins' deposition testimony was that his first knowledge of the actual availability of a position came from his telephone conversation of 12/6/76 with Dean Mohr. At trial he insisted that his first knowledge of the job came from his earlier conversation with Dr. Davis in Atlanta.

10. Plaintiff's Exhibit 8. The letter of Laurie Johnson, Dean of Students at Atlanta University, was written on December 13, 1976. It was not date stamped upon receipt by Dr. Davis.

His transcript from Georgia State University was prepared by that university on December 21, 1976.[11] His application could not have been "completed" in accordance with FAMU's definition of that term prior to December 22 or 23 at the earliest.[12] On December 14, 1976, Dean Mohr formally recommended that John H. Thompkins be employed in Position # 00270.[13]

John Thompkins admitted at trial that his Vita, which was the sole document before the screening committee at the time of Thompkins' interview and the sole document before the Dean at the time of his recommendation for employment, contained numerous inaccuracies. For example, Thompkins' Vita represents that he was a teacher at Eastlake Elementary School from October 1960 through June 1970; Thompkins testified that he held that position from October of 1969 to June of 1970. Thompkins' period of employment at Clark College was only from March of 1973 to January of 1974, yet his Vita shows such employment to have been from June of 1970 until January of 1974. Thompkins' Vita states he was employed by the Pennsylvania Department of Education from March 11, 1973 to August 11, 1976. Thompkins was employed there from March of 1974 until August of 1976. Additionally, Thompkins' Vita conflicts with his transcripts by indicating full time employment at Clark College in 1972 at the same time he was enrolled in 15 hours of courses at Georgia State University and 15 hours of courses at Atlanta University. Mr. Thompkins characterized these inaccuracies as "typographical errors."

The committee's interview of Thompkins, according to Davis, centered on questions generated from his Vita. In response to the court's inquiry whether the nine year error in Thompkins' Vita was discovered by the screening committee during its interview, Dr. Davis stated that she felt sure the committee was made aware of the error. Dr. Castine, a member of the committee, was unable to recall any acknowledgement of discrepancies in Thompkins' "qualifications" during the interview.

In the December 9 interview, Thompkins was asked by the committee what he could contribute to the FAMU program. According to Dr. Davis, Thompkins was interested in forming a special program at FAMU for exceptional children. He represented that he had experience in writing grant proposals; that he had been the major writer of a project in Pennsylvania. Dr. Davis noted that grants are important to FAMU. Dr. Davis testified, however, that she made no follow-up inquiry of the Pennsylvania Department of Education in regard to Thompkins' work there or the reasons for his separation from that employment. Dr. Davis further asserts that the committee was impressed with Thompkins' college teaching and his experience in teacher training. Dr. Davis did telephone Dr. Pearlie Dove of Clark College for an oral recommendation on the day Thompkins was interviewed and Dean Mohr informed her on December 10 that he had called Georgia State University to ascertain Thompkins' status with respect to his degrees.[14]

After the committee had interviewed Thompkins, the committee members submitted rating forms to Dr. Davis. The forms provided an opportunity for the members to rate Thompkins in his field and to rank him in comparison to the other applicants considered for the position. According to Dr. Davis, three committee members rated Thompkins "favorably"; one form (identified as Dr. Castine's) was neither favorable or unfavorable. Dr. Castine did not consider the interview period to be closed after Thompkins' interview because he knew of two additional applications. Dr. Castine was most definite that the commit-

---

11. *Ibid.*

12. Thompkins admitted that he did not have his major advisor of graduate work send a letter of recommendation to FAMU.

13. Defendants' Exhibit 6.

14. At that time, Thompkins had not yet taken his comprehensive exams and was still considered a candidate in the doctoral program at Atlanta University.

tee did not recommend employment of Thompkins on December 9, 1976; that a committee decision was not made at that point in time. On December 10, 1976, Dr. Castine reminded Dean Mohr of Schwartz's application for the position.

On the evening of December 9, 1976, following Thompkins' interview, Dr. Castine telephoned Dr. Schwartz to inquire if she had been scheduled to be interviewed for the position. On the morning of December 10, 1976, Dr. Schwartz called Dean Mohr to arrange an interview and was referred to Dr. Lillie Davis. Dr. Davis informed Rhea Schwartz that she was reviewing applications and would be scheduling interviews; she stated that Schwartz's application was in order. Dr. Schwartz confirmed the phone call with a letter of that date in which she reaffirmed her interest in the position.[15] Dr. Davis doesn't remember the telephone conversation of the morning of December 10, 1976.

On December 10, 1976, Dr. Lillie Davis wrote to Dean Mohr on behalf of the screening committee recommending that Mr. John Thompkins be hired as assistant professor in Special Education and that Dr. Barbara Palmer be hired in the reading teacher position. By her letter's postscript, Dr. Davis acknowledges that the recommendation is being made without receipt of a completed application form from Thompkins.[16] Dr. Castine testified, however, that a Vita, with a cover letter, was occasionally considered in lieu of the required application.

Dr. Davis asserts that she knew of only Thompkins' "application" for the assistant professorship and Palmer's application for the position as reading teacher. She claims that after her letter of December 10, 1976 was received by Dean Mohr, he came to her office and told her, "you're supposed to interview all the applicants." Dr. Davis states that she only knew who to interview

by the Vitae received from the Dean's office and she had only received Thompkins' and Palmer's. She admits that between the November advertisement and the December 3 closing date she never checked with the Dean's office to see if there were other applicants.

On Monday, December 13, 1976, at approximately 9:00 a. m., Dr. Schwartz was telephoned by Dr. Davis' secretary and given notice that her interview was scheduled for 10:30 that morning. Dr. Schwartz was interviewed by the screening committee for about one to one and one-half hours. She was surprised to be told at the interview that the position she was seeking was temporary; she responded that she was still interested in the position and that she would take the temporary position if it was offered to her.

The third applicant for the assistant professorship, Ms. Lillie Bogen, was interviewed on the same day as was Rhea Schwartz.[17] Both Dr. Castine and Dr. Davis insist that they interviewed all candidates with an open mind. There is conflicting testimony, however, with regard to the committee's resultant action: Dr. Davis says the committee met the following morning to finalize their decision and agreed to recommend Thompkins. Dr. Castine says the committee met briefly at the conclusion of the third interview to complete their forms, that there was no necessity for a separate meeting because the chairman could tabulate the ranking of the candidates from the forms. Dr. Castine does not recall a meeting on the morning of December 14, 1976. He states there was no actual vote by the committee.

Dr. Davis says that immediately following the interview with Ms. Bogen, the committee discussed all three candidates. Ms. Bogen was eliminated because her expertise was with the hearing impaired and this

---

15. Plaintiff's Exhibit 6.

16. Plaintiff's Exhibit 5 (Appendix B).

17. Dr. Davis testified on the first day of trial that Ms. Bogen was interviewed three or four

days after Dr. Schwartz. On the second day of trial Dr. Davis testified, as had Dr. Castine, that Ms. Bogen was interviewed on December 13, 1976, as was Dr. Schwartz.

position was out of her area. Thompkins and Schwartz were compared, according to Dr. Davis, and Thompkins was chosen by committee members Davis, Mercer and Broadley because of his college teaching and because he was seeking a degree on the administrative level; Schwartz's experience was considered to be in the public school level. Dr. Davis says only Dr. Castine supported the choice of Dr. Schwartz. Furthermore, Dr. Davis claims the committee met the following morning and reached consensus that Thompkins was their choice. Dr. Davis then informed Dean Mohr orally that "Thompkins was the one." Mohr signed the recommendation for employment of Thompkins in a permanent position on that day, Tuesday, December 14, 1976.

By letter from Lillie S. Davis, dated December 15, 1976 and received on December 22, 1976, Dr. Schwartz was thanked for her "interest in the position of teacher of reading" and for her time spent in the interview. Dr. Davis' letter stated ". . . the Committee did not affect closure on your application at this time."[18] Dr. Schwartz inquired of Dr. Davis about the language in the letter and was told that the reference to the position of reading teacher was a typographical error and that the letter was meant to advise her that she had not been selected for the position of assistant professor in Exceptional Child Education. Dr. Schwartz inquired once again of Dr. Castine, who assured her that she was qualified for the position.

After receiving Dr. Davis' clarification that she had been rejected for the special education position, Dr. Schwartz requested of Dean Mohr in writing that in accordance with Florida's Public Records law and Section 239.78 Fla.Stat. (1977) she be allowed to see the application of the person hired for the position for which she had applied. Dean Mohr refused to allow Dr. Schwartz to see Thompkins' application.

Dr. Schwartz has obtained employment subsequent to FAMU's selection of Thompkins in the position for which she had applied: In the summer of 1977, she taught as a visiting professor in Exceptional Child Education at York University in Toronto, Canada; in February to May of 1978 she worked as a project director in the FSU child care project; and she has taught as a substitute teacher in the Leon County Schools and at FSU's Florida High School.

Thompkins was recommended for employment in Position # 00270, a permanent, tenure-earning position, by Dean Mohr and subsequently by Gertrude S. Simmons (Black female), Vice President for Academic Affairs, at the starting salary of $14,500 for the nine-month contract period. Position # 00270 had been advertised as having a salary range of from $11,000 to $13,000 for nine months. Salary recommendations are made by the Dean and the Vice President of Academic Affairs with the ultimate authority resting in the University President. Thompkins' salary for the 1978–79 academic year was $15,500 to $16,000, and in the 1979–80 academic year it is $16,500.

Dr. Benjamin L. Perry (Black male) was FAMU's President at the time of the decision to hire Thompkins.[19] Perry testified that FAMU was originally a Black institution by law, until after the decision of the United States Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In 1965 during the administration of Dr. Gore, FAMU's President prior to Perry, FAMU hired its first White faculty member. Perry testified that it was his desire to maintain FAMU as a Black institution; that FAMU's heritage had been molded by Blacks and he (Perry) sought to preserve that heritage by preserving a Black faculty and staff. Perry admitted to making statements to that effect and to the effect that FAMU was not in a hurry to recruit Whites as recently as the early 1970s.

Perry stated, however, that his personal goal for the university had been modified by social evolution and revolution. He referred specifically to the mandates of the

18. Plaintiff's Exhibit 7.

19. Perry was President of FAMU from September of 1968 until September of 1977.

Office of Civil Rights Compliance which he claimed guided the university and its administration in tempering its point of view. According to Dr. Perry, he set up the search committee procedure of recommending faculty appointments as one means of vesting authority in administrators other than himself, although he admitted that the committee had power only to recommend. The search committee procedure evidently replaced the "invitational" method of hiring utilized when Dr. Davis was hired.

Perry was evasive with respect to the university's response to plaintiff's interrogatories concerning White females employed as assistant professors in 1975 (8%), 1976 (9%), 1977 (10%) and 1978 (10%). It sounded correct to him that in 1975 FAMU's faculty included eight White females out of 89 assistant professors; he asserted that the proportion of Whites in his total faculty at that time was about 10%. FAMU was pursuing a goal, he stated, of 33⅓% White faculty members.

Perry testified that during his administration of FAMU the search committees were instructed to abide by the guidelines of the desegregation order in making their recommendations, which meant no denials of employment on the basis of race, religion, or sex. At the same time he said, there was probably some discussion in the administration's instructions about the employment of too many FAMU and FSU graduates and too many males. According to Dr. Perry, the search committees had the major responsibility in making employment choices; they were to follow the guidelines of affirmative action under the desegregation plan and meet the needs of the institution and the department by their choices. Perry claimed that although the ultimate authority for hiring vested in him, he personally gave this authority to the Deans and their search committees.

On January 1, 1977, the Department of Early Childhood and Elementary Education into which John H. Thompkins and Dr. Bar-

bara Palmer (White female) had just been hired included six female and eight male faculty members. One female, Dr. Palmer, was White and the remaining five were Black. Dr. Davis commented to Dr. Castine after the hiring of Thompkins and Palmer that the search committee in the department had covered all four categories of Black, White, male and female in its choices. Dr. Palmer was hired as reading teacher in a temporary non-tenure earning associate professorship in which she had to be rehired each quarter.[20] After three quarters of employment at FAMU she left and Susan Simmons (White female), who did not have a Ph.D., was hired as reading teacher in a temporary instructorship. Simmons was told by the administration that without a Ph.D. her position could not be made permanent and, even with a Ph.D., it would be very difficult to have the position made permanent.

Neither Dr. Schwartz, Dr. Palmer, nor Susan Simmons could point to any overt act of racial or sexual discrimination against them in either their job interviews or, in the case of the latter two women, during the period of their employment at FAMU. FAMU's representatives denied any discriminatory motive or intent in any of their actions.

### Conclusions of Law

Plaintiff Schwartz brought this action pursuant to 42 U.S.C. § 2000e *et seq.* (Title VII of the Civil Rights Act of 1964), 42 U.S.C. § 1981 and the Fourteenth Amendment to the United States Constitution, which have different standards of proof.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court delineated the order and allocation of proof in a private, non-class Title VII action challenging employment discrimination. The plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing (1) that she belongs to a pro-

---

**20.** Dr. Palmer was not told why the position was permanent for her predecessor, Elsie Wal-

lace (Black female), but temporary for her.

tected class; (2) that she applied and was qualified for a job for which the employer was seeking applicants; (3) that she was rejected notwithstanding her qualifications; and (4) that after her rejection, the employer continued to seek applicants for the position from persons having plaintiff's qualifications. The Court indicated these elements necessarily will vary depending on the factual context out of which the case arises. *McDonnell Douglas* made clear, however, "that a Title VII plaintiff carries the initial burden of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the [Civil Rights] Act [of 1964].'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1977).

To dispel the adverse inference from the plaintiff's prima facie case, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the plaintiff's rejection. *McDonnell Douglas Corp. v. Green, supra* at 802, 93 S.Ct. at 1824. The employer is not required to prove the absence of discriminatory motive, but is required to explain what he has done or produce evidence of legitimate, non-discriminatory reasons for his actions. *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

■ Finally, the plaintiff must be given an opportunity to show that the stated reason for rejection is in fact a pretext. *Furnco Construction Corp. v. Waters, supra* at 578, 98 S.Ct. at 2950. It is now established that Title VII, as well as § 1981, prohibits racial discrimination in employment against White persons as well as non-Whites, and the same standards are applicable to instances of discrimination against either race. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 280, 96 S.Ct. 2574, 2579, 49 L.Ed.2d 493 (1976). In order to prevail on her Title VII claim, the plaintiff in this case must convince the court by a preponderance of the evidence that FAMU's refusal to hire her as assistant professor in special education was based on the fact that she was a White female, rather than the fact that the person hired was better qualified for the position.

■ There is ample evidence in the record to support the court's conclusion that Dr. Schwartz established a prima facie case. She was a White female seeking employment with a formerly all-Black institution which was operating under a mandate from the Office of Civil Rights Compliance to desegregate. She was the only applicant whose name and qualifications were forwarded to FAMU by the Board of Regents Personnel Programs Office as qualified for the original vacancy listing of Position # 00270. She made separate and complete application for Position # 00270 in response to the second vacancy listing after the original qualifications had been relaxed. She was assured that she was qualified for the position by both Van Beck and Dr. Castine, specialists in making such evaluations. Despite her superior qualifications on paper, she was rejected for the position so that John H. Thompkins might be hired. Plaintiff Schwartz's establishment of a prima facie case raises an inference that FAMU's rejection of her was based on consideration of the impermissible factors of her race and sex.

■ The defendants attempt to counter plaintiff's prima facie case by articulating as their legitimate non-discriminatory reason for rejecting Schwartz that she was less well qualified for the position than applicant Thompkins. Defendants' repeated assertion is that Schwartz lacked Thompkins' experience in college teaching and teacher training.

In comparing the two job candidates as she said the committee had evaluated them, Dr. Davis testified that Dr. Schwartz had no college teaching experience. Dr. Schwartz's resume shows seven months teaching experience as an FSU instructor of

Early Childhood Education, a total of one and one-half years as a graduate assistant working in the clinical teacher model project, and three additional months as a graduate assistant in Early Childhood Education. The letters of recommendation submitted in her behalf refer to her performance and abilities as a teacher and preparer of teachers. Additionally, Dr. Schwartz's dissertation dealt with instruction of prospective teachers. By comparison, Mr. Thompkins, whose college teaching and teacher training were said to have impressed the committee, testified that he had only 10 months of teaching experience at Clark College.

Defendants, through the testimony of Dr. Davis, also seek to place emphasis on Thompkins' enrollment in a doctoral degree program in educational administration at the time of his consideration by FAMU. The plaintiff, in contrast, had already been awarded a doctoral degree in education, the terminal degree in the field of the position for which selection was being made. Defendants did not explain the purported superiority of an enrollee in an administrative degree program as a teacher in Position # 00270.

Dr. Davis asserted that applicant Schwartz lacked the "versatility" needed for teaching in college, although she did not specify what she meant by the term. Dr. Schwartz's teaching certificates indicate official recognition by the Florida Department of Education of her training to teach as many different types of courses, exceptionalities, and age groups as indicated in Thompkins' Vita, with the possible exception of his experience in operating audio visual equipment. Dr. Schwartz has approximately four times as many total years teaching experience as Thompkins, in approximately three times as many different employment experiences. Furthermore, when the errors in Thompkins' Vita are considered, as Dr. Davis was sure they were, there is some question whether Thompkins' total work experience satisfies the five years of experience requirement of the position vacancy listing. Any reliance on Mr. Thompkins' supposed abilities as a writer of grants is seriously questioned by this court in view of the defendants' failure to make any inquiry of the Pennsylvania Department of Education concerning Thompkins' job performance there and separation from his employment.

The United States Court of Appeals for the Fifth Circuit held in *East v. Romine*, 518 F.2d 332 (5th Cir. 1975), that the defendant employer must introduce comparative evidence in his rebuttal of plaintiff's prima facie case of disparate treatment that shows the person he hired was somehow better qualified than was plaintiff. In addition, the defendant must, in accordance with *Turner v. Texas Instruments*, 555 F.2d 1251, 1255 (5th Cir. 1977) prove the non-discriminatory reasons he has articulated for the rejection of plaintiff by a preponderance of the evidence. This court is unable to find that these defendants have carried their burden on either of these requirements.

The court finds, instead, that the stated reasons of Dr. Schwartz's lack of experience in college teaching and teacher training are merely a pretext for racial and sexual discrimination against her on the part of FAMU. The plaintiff's resume, letters of recommendation, and teaching certificates are evidence that she was thoroughly qualified for the position she sought. In the court's opinion she was better qualified than was the Black male selected for employment.

■ Defendants assert that neither 42 U.S.C. § 2000e *et seq.* nor 42 U.S.C. § 1981 give this court authority to substitute its judgment with regard to individual faculty appointments for the judgment and sound discretion of university administrators and educators. In the absence of evidence of abuse of administrative discretion and discriminatory practice this court agrees that faculty selection should be left to academic

administrators. *Green v. Board of Regents of Texas Tech. University*, 335 F.Supp. 249, 251 (N.D.Tex.1971). The very cases upon which defendants rely, however, qualify the circumstances under which federal courts should refuse to intervene in a university's decisions.

> The findings and decision of academic administrative bodies are to be upheld by the courts when reached by correct procedures and supported by substantial evidence. *Duke v. Texas State University*, 469 F.2d 829 (5th Cir. 1972); *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970).

*Green v. Board of Regents of Texas Tech. University, et al.*, 474 F.2d 594, 595 (5th Cir. 1973).

There is substantial record evidence in the instant case of procedural irregularities in FAMU's rejection of Schwartz and selection of Thompkins. FAMU asserts that although their own procedures may not have been properly complied with in this particular instance, the university's actions were not motivated by discriminatory intent. It is difficult for this court to believe FAMU's explanation for its administrators' actions.

Dr. Davis' predisposition to consider Thompkins not only an applicant for the assistant professorship but the applicant who would be hired is evidenced in her solicitation of Thompkins' Vita, her letter of December 3, 1976 to Dean Mohr, her telephone conversation with Thompkins about "housing in Tallahassee" sometime prior to December 6, 1976, and her letter recommending his employment in the position on December 10, 1976. Dr. Davis' explanation for her bias in Thompkins' favor is that she knew only of his application for the position.

Dr. Davis' offer in the December 3, 1976 letter to pick Thompkins up at the airport indicates that she had communicated with Dean Mohr previously about Thompkins' "application" and interview, yet she claims to have never asked the Dean if there were other applicants for the position.

Dean Mohr knew of Dr. Schwartz's interest in the specialized area of Exceptional Childhood Education as early as 1974 and was personally notified of her completed application for this particular position of assistant professor in November of 1976. FAMU's EEO Coordinator was notified in August of 1976 of Schwartz's qualifications for the position as first advertised. Yet, on December 6, 1976 Dean Mohr arranged for only Thompkins' interview and circulated only Thompkins' Vita to the search committee members. After assuring Dr. Schwartz by telephone on the morning after Thompkins' interview that Schwartz's application was complete and an interview would be scheduled, Dr. Davis proceeded on that same day to recommend on behalf of the committee that Thompkins be hired in the position. When asked to explain her action, Dr. Davis simply could not recall the telephone conversation.

The court is persuaded that the issues of credibility raised by this evidence must be resolved in favor of the plaintiff; for if defendants' explanations were to be accepted, the court would be required to believe that the university's administrators, and particularly Dr. Davis, who are educated, experienced, and highly paid individuals, are at the same time totally unqualified to handle even the traditional duties of their administrative positions. The court is unwilling to believe that FAMU and the state university system would have retained such incompetents, much less have rewarded their ineptitude with promotion.

Dr. Davis denied that Thompkins was a close friend, describing him as only "an acquaintance." Her reference to Thompkins as "Mr. Thompson" throughout her December 3, 1976 letter suggests that they were not close friends. Her disavowal of cronyism as a motivation makes Dr. Davis' efforts on Thompkins' behalf appear more likely to have been motivated by racial and sexual preference.

The evidence that the Black search committee members rejected Schwartz in favor of Thompkins along strictly racial and sexu-

al lines, that the meeting at which the committee reached unanimous approval of Thompkins cannot be recalled by Dr. Castine (a thoroughly credible witness), that Dean Mohr recommended Thompkins' employment immediately following the other candidates' interviews at a rate $1500.00 above the maximum advertised for the position and before receipt of his transcripts, letters of recommendation and application are further indicia of what this court concludes is racial and sexual preference, in view of defendants' inability to prove that Thompkins' college teaching and teacher training made him the superior candidate for employment.

While attempting to divest himself of responsibility for this particular hiring choice, Dr. Perry nevertheless indicated that as FAMU's president he was less than enthusiastic with respect to satisfying the desegregation goals of the Office of Civil Rights Compliance. The court must assume that FAMU's administrators to whom Perry ostensibly delegated authority to make hiring decisions were not unaware of Perry's publicly-expressed attitude. Perry admitted that although the university's goal during the period with which we are concerned was to have Whites constitute 33⅓% of the faculty, only about 10% of the total faculty were White.

It is plaintiff's view that the defendant university's search committee and Dean were predisposed to reserve the reading teacher position in the department for a White female and thereby have White females represented on the department faculty, but singularly in a temporary position. Dr. Davis' letter of December 3, 1976 showing her predisposition to hire Thompkins and Palmer and her remark to Dr. Castine that all categories of Black, White, male and female had been covered by the committee's choices are indicia that plaintiff's view is correct. The fact that the reading teacher position was permanent for a Black female, but temporary for subsequent White females, is indicative of discrimina-tion against White females in the department and the fact that only 9% of FAMU's assistant professors were White females at the time of plaintiff's rejection is indicative of university-wide discrimination against White females in the position category. The employer introduced no comparative statistics relating to the number of White females hired or promoted to counter this impression. *Jefferies v. Harris Cty. Community Action Ass'n,* 615 F.2d 1025 (5th Cir. 1980).

■ The court concludes that the most credible explanation of plaintiff's rejection for position # 00270, and the selection of Thompkins, is that Thompkins, by virtue of his race and sex, was the preferred candidate. Accordingly, the court concludes that defendants have discriminated against Dr. Schwartz on the basis of her race and sex and have, thus, violated Title VII.

■ In addition, the court concludes that the totality of relevant facts in this case establish discriminatory intent on the part of the university's representatives and an invidious discriminatory purpose in their actions. Despite defendants' protestations that discriminatory intent cannot be proven absent evidence of any overt discriminatory act on their part, the court finds the law to be otherwise. *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976). It is ironic that "word of mouth" recruiting and subversion of proper procedures, which have long been disapproved where they serve to perpetuate an all-White work force, *United States v. Georgia Power Co.,* 474 F.2d 906, 925 (5th Cir. 1973); *Franks v. Bowman Transportation Co.,* 495 F.2d 398 (5th Cir. 1974); cannot be recognized by defendants as persuasive indicia of racial discrimination in employment practices.

■■ The court concludes that defendants have intentionally discriminated against Dr. Schwartz on the basis of her race and have, thus, violated 42 U.S.C.

§ 1981. Additionally, because defendants' action in this instance is "state action", the court concludes that defendants have violated the Equal Protection Clause of the Fourteenth Amendment.

■ Although the statutory remedies under Title VII and 42 U.S.C. § 1981 exist separately and independently, the plaintiff cannot be awarded overlapping remedies. *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641 (5th Cir. 1974), *reh den* 503 F.2d 567 (5th Cir. 1974). Plaintiff is eligible for the relief provided in 42 U.S.C. § 2000e–5, including injunction of defendants from engaging in racial and sexual discrimination against her and hiring by defendants as an assistant professor in Early Childhood and Special Education.

> [G]iven a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.

*Albermarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975). Plaintiff is eligible for back pay equivalent to the salary paid to John H. Thompkins from the period of the unlawful denial of employment, with reduction of such back pay by the amount of her interim earnings that could not have been earned if she had been employed in the nine-month position at FAMU. *Butta v. Anne Arundel County*, 473 F.Supp. 83, 89 (D.Md.1979).

Defendants are reminded with respect to Title VII:

> Discriminatory preference for any group, minority or majority, is precisely and only what Congress proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.

*Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). "At least since July 2, 1965, the effective date of Title VII, the employers of this nation have been on notice that employment discrimination based on race, whether overt, covert, simple or complex, is illegal." *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1377 (5th Cir. 1974).

## ORDER

In accordance with all of the foregoing, it is

### ORDERED AND ADJUDGED:

1. Defendants are enjoined from any further discrimination against the plaintiff on the basis of her race and sex.

2. Plaintiff shall be hired by defendants in the nine-month tenure-earning position of assistant professor in Exceptional Childhood Education; such hiring to be retroactive to January 1, 1977, and to take place no later than July 1, 1980.

3. Plaintiff shall recover from defendants back pay equivalent to the salary paid to John H. Thompkins for the period during which she has been illegally denied employment; such back pay to be reduced by the amount of interim earnings which she could not have earned had she been employed in the nine-month assistant professorship at FAMU during the 1976–77, 1977–78, 1978–79, 1979–80 school terms.

4. Plaintiff is awarded her attorneys' fees and costs. Plaintiff has seven working days from the date of this order to submit affidavits on attorneys' fees and costs to defendants. Defendants have seven working days in which to respond. Following such response, the parties have seven working days in which to negotiate a settlement of the amount to be awarded. Evidentiary hearing on the award of attorneys' fees and costs is hereby scheduled in this court at 2:00 p. m. on June 20, 1980.

5. The Clerk of this Court will enter judgment accordingly.

Appendix to follow.

APPENDIX A

# Florida Agricultural and Mechanical University
### Tallahassee, Florida
##### 32307

December 3, 1976

COLLEGE OF EDUCATION
DIVISION OF CURRICULUM AND INSTRUCTION

Dr. Paul B. Mohr, Dean
College of Education
Florida A and M University
Campus

RE: Interview of Mr. John Thompson

Dear Dr. Mohr:

I feel that the following team would adequately assess Mr. Thompson's competency to assume the position of assistant professor in Exception Child Education:

> Mrs. Mary Mercer
> Dr. W. H. Castine
> Mrs. Barbara Boardley
> Dr. L. S. Davis

Mrs. Boardley is suggested because of her background in Early Childhood Education and the fact that additional assistance and guidance is needed in this area. Mr. Thompson has a Master's degree in Early Childhood Education. Dr. Lemon's experience is somewhat limited, including training, and I feel that he needs to spend more time on building the program in language arts and reading.

I will pick up Mr. Thompson if you will let me know his arrival time, that is if he does not motor, which I feel that he will do.

The Conference Room appears a proper setting for the interview, after which Mrs. Mercer and Mrs. Boardley can show him around the setting and further discuss the details of their plans and work with him.

Incidently, I am particularly interested in developing a B E H proposal, and the Consortium training session for this activity is now rescheduled for January 17 - 20, 1977, at Charlottesville, Virginia. In view of the changes that have taken place since September, I now suggest that the team to attend this conference consist of Davis, M. Mercer, and Mr. Thompson and Dr. Palmer if they are on board by that time.

I will let you notify the team for the intervies. Perhaps ten o'clock will be a good hour.

Yours truly,

L. S. Davis, Area Coordinator

APPENDIX B

December 10, 1976

Dr. Paul B. Mohr, Dean
College of Education
Florida A and M University
Campus

Dear Dr. Mohr:

The Screening Committee for interviewing applicants for the positions reading teacher and teacher of exceptional child education have been favorably impressed with the qualifications of the candidates who have been interviewed. This is to say that both positions are now classified as temporary therefore we recommend filling them as follows:

Reading Teacher: Dr. Barbara Fulmer

Special Education: Mr. John Thompkins

We would appreciate your favorable consideration of these two recommendations.

L. S. Davis, Chairman
Screening Committee

P.S.: I shall ask Mrs. Davis for an application blank for Mr. Thompkins

EXHIBIT TO #11